T-H

8-A

# CLAIM FOR DAMAGE, INJURY, OR DEATH

**INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

FORM APPROVED
OMB NO. 1105-0008

| | |
|---|---|
| **1. Submit to Appropriate Federal Agency:**<br>J. A. Keller<br>DOJ-FBOP Regional Director<br>344 Marine Forces Drive<br>Grand Prairie, TX 75051 | **2. Name, address of claimant, and claimant's personal representative if any.** (See instructions on reverse). Number, Street, City, State and Zip code.<br>Rafael Daniel De la Cruz Jimenez<br>Oakdale FCI - 1  Reg. No. 56269-004<br>P.O. Box 5000<br>Oakdale, LA 71463-5000 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 04-10-69 | Single | See Attached | See Attached |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See Attached

Exhibit "1"

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

N/A

RECEIVED JUL 17 2017 BUREAU OF PRISONS

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See Attached

**11. WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| See Attached | |

**12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| | $10,000,000.00 | | $10,000,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| Rafael Daniel De la Cruz Jimenez | N/A (Prisoner) | 7-13-17 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

95-109

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

**15. Do you carry accident insurance?** ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No

**16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?** ☐ Yes  ☒ No   **17. If deductible, state amount.**

N/A

**18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).**

N/A

**19. Do you carry public liability and property damage insurance?** ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☒ No

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in Item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
 A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

RULINCS 10579062 - STILLEY, OSCAR AMOS - Unit: OAK-E-B

FROM: 10579062
TO:
SUBJECT: SF95_DeLaCruzDaniel
DATE: 07/12/2017 06:19:40 PM

Exhibit "2"

ATTACHMENT TO STANDARD FORM 95 TORT CLAIM OF RAFAEL DANIEL DE LA CRUZ-JIMENEZ 56269-004

All claims herein are brought on the theory of negligence as well as any other appropriate theory reasonably discernable from the facts stated.

PARAGRAPH EIGHT. Basis of claim:

1) Claimant became ill sometime about early to mid March, 2017. Claimant began going to Oakdale-1 sick call, and went to sick call many times, estimated to be between 10 and 15 times. Medical records should show the dates and times and complaints. Claimant was suffering vomiting, headache, nausea, constipation, and increasing difficulty to even walk.

Claimant was diagnosed with depression by Dr. Alexandre (with Ms. Thomas) and prescribed pills. Medical personnel tried to coerce Claimant into admitting that his problem was depression, but Claimant refused. Claimant was sent to the head psychologist on the compound, Ms. Morehart, whose secretary interviewed Claimant and wrote a prescription for depression medication.

As of 4-17-17 Claimant began to write cop-outs, because he was so ill that he could scarcely even get to sick call on his own. Claimant could get off his bunk and walk only with great effort. Between 4-17-17 and 5-10-17, Claimant had only one tiny bowel movement. Claimant simply couldn't defecate, and his body began substituting vomiting, as a means of expelling wastes.

Claimant repeatedly pleaded for a wheelchair, so he could travel the substantial distance (about 480 of the short steps Claimant could make, roughly 1,000 feet) to the chow hall, to medical, etc. All these pleas fell on deaf ears. The DOJ-FBOP personnel at Oakdale-1 are notorious for denying disabled inmates (whether short or long term) of paid assistants, despite the fact that facility paid inmate assistants could be procured for $69 per month or even less. Disabled inmates are forced to either beg for "free" assistance from charitable fellow inmates, or pay other inmates to help, despite legal authorities that provide for full employment for inmates who desire jobs.

On or about 4-19-17, Claimant passed out in the chow hall, and had to be half carried, half drug out of the chow hall, put on a cart, and taken to medical. Claimant was taken to a hospital and examined for constipation only - one symptom only, of all the symptoms set forth above, which were afflicting Claimant. Claimant's condition continued to deteriorate.

On 5-10-17 Claimant was taken to Oakdale-1 Medical for an examination by staff, including Psychological staff, because medical personnel still couldn't bring themselves to admit that Claimant actually had a severe physical problem. After the evaluation (including x-rays) Claimant was taken to Oakdale Community Hospital in Oakdale, LA, where an MRI disclosed a tumor at the base of Claimant's brain.

Claimant was then moved to Rapides Regional Medical Center, where the tumor was removed on 5-12-17. Claimant then went to Intensive Care Unit (ICU) for 2 days, then to a patient room for 2 days. Claimant had a decent bed and pillow, suitable for recovery from surgery. Claimant's room had a window, which the guards closed off on claims of "security."

Claimant was sent back to recuperate in SHU (Special Housing Unit, or jail for the prison). This is the equivalent of taking a person in the free world straight from major surgery in the hospital to the local jail, to solitary confinement, in a facility that makes a complete and utter mockery of the standards of the American Correctional Association (ACA) and other accrediting authorities.

Oakdale-1 denied Claimant a ladder to hold to in order to maneuver in and out of bed. Oakdale-1 denied Claimant translucent windows, a decent bed and pillow, etc. In short, Oakdale-1 did what it could to make Claimant miserable, in flagrant disregard of the Standards and Expected Practices of the ACA. Claimant hereby incorporates Docket #27 of Stilley v. US et al, EDAR 15-cv-163 BSM/BD, (available on PACER) as if attached hereto and set forth word for word. Oakdale-1 is grossly negligent in failing to comply with the ACA rules and Expected Practices, despite repeated polite offers of help from the inmate population.

Oakdale-1 advertises itself to be accredited by the Joint Commission, with a certificate on the wall, yet the Joint Commission says that Oakdale is NOT accredited by their organization.

RULINCS 10579062 - STILLEY, OSCAR AMOS - Unit: OAK-E-B

--------------------------------------------------------------------------------

On or about 5-19-17, Claimant began to feel fluid leaking from the surgical incision some time after returning to Oakdale-1 SHU. Claimant told the medical personnel, but was not allowed to go back to the doctor.

Claimant returned to the doctor on May 31, 2017. The doctor was shocked to learn that fluid had been leaking for about 12 days. The doctor explained that spinal fluid was leaking, and that this leakage could have resulted in severe permanent disability. The doctor repaired the damage.

Claimant talked in his sleep due to the medications given for pain. One of the guards became angry and began hurling epithets, saying "fuck you!" over and over. Claimant despite his hazy consciousness tried to explain that he was sick and wasn't talking or disturbing the guard on purpose. The guard nevertheless continued to say "fuck you!" to Claimant. Claimant was terrified and could not sleep for the rest of the night.

On or about 6-5-17 Plaintiff was taken from the hospital to Oakdale-1 SHU. Claimant was placed in a regular SHU cell, the same sort of cell which an inmate would occupy as punishment for violating prison rules. Claimant was forced to sleep on a highly unsuitable mat, without a pillow reasonably suited for recovery from surgery. Claimant was denied the assistance normally provided by other inmates with charitable impulses. Claimant remained in SHU until 6-19-17, whereupon Claimant returned to the compound.

Other federal prisons have medical rooms with real beds and real pillows and windows that allow the inmate to look outside the room. There is no logical reason that Oakdale-1 could not do the same, if a decision was made to prepare, maintain, and use such a room.

PARAGRAPH TEN. State nature of extent of injury that forms the basis for the claim:

1) Claimant was utterly miserable and could not defecate for about 35-40 days. During this same period of time Claimant suffered extreme pain, and could get around only with extreme and increasing difficulty.

Claimant lost weight, from a starting weight of about 174 pounds down to 139 pounds before he had to quit eating to prepare for surgery. The cessation of eating preparatory for surgery only reduced Claimant's weight by about 3 additional pounds, down to 136.

The denial of a wheelchair forced Claimant to allow other inmates to get on each side of him, in order to keep him from falling. This was humiliating, debilitating, and painful, since the other inmates had to exert substantial force to keep Claimant from falling down. Many DOJ-FBOP personnel observed the Claimant wobbling his way back and forth to chow hall and to Health Services, yet nobody intervened to see that Claimant was provided with a wheelchair and an inmate assistant.

Claimant suffered unnecessary physical pain and mental anguish from the time that his initial visits to medical were brushed off and treated as if they were mere psychological weaknesses, up through and including the time that he was finally discharged back onto the compound June 19, 2017. Had Claimant received competent medical evaluation, diagnosis, and treatment, Claimant could have gotten treatment by a competent surgeon, with a reasonable place to recuperate, which would have taken a relatively short period of time.

Claimant's recuperation time was made miserable, and lengthened, by denying Claimant a reasonable bed, in a reasonable room, maintained in compliance with all the Standards and Expected Practices of the ACA. Claimant's window with transparent glass had a piece of cover glass over it, that lets in a small amount of diffuse light, but through which one cannot see anything. The failure to maintain proper rooms, in full compliance with the ACA, for convalescence and recovery from surgery or other procedures amounts to negligence or gross negligence or worse. Such neglect and failure in this case caused Claimant serious suffering, damage, and harm both physical and psychological.

Claimant suffered the loss of spinal fluid for about 12 days, between the time that he reported it and the time he finally got appropriate care. This amounts to negligence, gross negligence, or worse, which increased the total time of convalescence, loss of function, loss of the normal pleasure of living, etc.

After the surgery, all the symptoms set forth above promptly disappeared, with the following provisos. Claimant is now left with a spot on his left eye, which started about the time Claimant was no longer able to walk unassisted, about 3 days prior to the surgery. In addition, Claimant now shakes, has difficulty remembering things that were previously easy to remember, and does not have the fine motor skills that he had before.

s a result of the shakes, loss of fine motor skills, damage to memory abilities, and other damage to brain and nerve tissue, :c., occasioned by the undue delay in treatment, Claimant is disabled from performing many activities which he formerly ɔrformed. For example, Claimant was a licensed pilot. Due to the damage set forth in this paragraph, Claimant is not ʝalified to be a licensed pilot. Only time will tell if this injury will heal up, to the point that Claimant can enjoy such activities as ⁄ing airplanes. The damage to Claimant's ability to function at a high level, sufficient to be a licensed pilot, and do other high ;ill activities, is the result of delay. Claimant reported the problem timely, before the symptoms became extreme, and could ave had the full restoration of function at a high level, if he had received TIMELY evaluation, diagnosis, and treatment by ɔmpetent medical providers.

laimant has also suffered psychological injury as a result of coming to know, experientially, that Oakdale-1 will deny an inmate ɔpropriate medical care until the inmate quite simply loses consciousness. Plaintiff continues to suffer psychologically from e knowledge that his medical care is totally within the control of an organization that shamelessly turns its head from the most ɔrrific illnesses, injuries, diseases, and medical conditions.

ARAGRAPH ELEVEN. Witnesses: Medical and scheduling personnel of any level of the DOJ-FBOP having knowledge of levant facts, including but not limited to backlogs, failure to provide logistical support for medical trips, etc; inmates in aimant's housing unit who had to help Claimant get around.

/s/ Rafael Daniel De La Cruz Jimenez
ɪfael Daniel De La Cruz Jimenez

7-13-17
Date

ATTACHMENT TO STANDARD FORM 95 TORT CLAIM OF RAFAEL DANIEL DE LA CRUZ-JIMENEZ 56269-004

All claims herein are brought on the theory of negligence as well as any other appropriate theory reasonably discernable from the facts stated.

PARAGRAPH EIGHT. Basis of claim:   *Exhibit "3"*

1) Claimant became ill sometime about early to mid March, 2017. Claimant began going to Oakdale-1 sick call, and went to sick call many times, estimated to be between 10 and 15 times. Medical records should show the dates and times and complaints. Claimant was suffering vomiting, headache, nausea, constipation, and increasing difficulty to even walk.

Claimant was diagnosed with depression by Dr. Alexandre (with Ms. Thomas) and prescribed pills. Medical personnel tried to coerce Claimant into admitting that his problem was depression, but Claimant refused.

Claimant was sent to the head psychologist on the compound, Ms. Morehart, whose secretary interviewed Claimant and wrote a prescription for depression medication.

As of 4-17-17 Claimant began to write cop-outs, because he was so ill that he could scarcely even get to sick call on his own. Claimant could get off his bunk and walk only with great effort. Between 4-17-17 and 5-10-17, Claimant had only one tiny bowel movement. Claimant simply couldn't defecate, and his body began substituting vomiting, as a means of expelling wastes.

Claimant repeatedly pleaded for a wheelchair, so he could travel the substantial distance (about 480 of the short steps Claimant could make, roughly 1,000 feet) to the chow hall, to medical, etc. All these pleas fell on deaf ears. The DOJ-FBOP personnel at Oakdale-1 are notorious for denying disabled inmates (whether short or long term) of paid assistants, despite the fact that quality paid inmate assistants could be procured for $69 per month or even less. Disabled inmates are forced to either beg for "free" assistance from charitable fellow inmates, or pay other inmates to help, despite legal authorities that provide for full employment for inmates who desire jobs.

On or about 4-19-17, Claimant passed out in the chow hall, and had to be half carried, half drug out of the chow hall, put on a cart, and taken to medical. Claimant was taken to a hospital and examined for constipation only - one symptom only, of all those symptoms set forth above, which were afflicting Claimant. Claimant's condition continued to deteriorate.

On 5-10-17 Claimant was taken to Oakdale-1 Medical for an examination by staff,

including Psychological staff, because medical personnel still couldn't bring themselves to admit that Claimant actually had a severe physical problem. After the evaluation (including x-rays) Claimant was taken to Oakdale Community Hospital in Oakdale, LA, where an MRI disclosed a tumor at the base of Claimant's brain.

Claimant was then moved to Rapides Regional Medical Center, where the tumor was removed on 5-12-17. Claimant then went to Intensive Care Unit (ICU) for 2 days, then to a patient room for 2 days. Claimant had a decent bed and pillow, suitable for recovery from surgery. Claimant's room had a window, which the guards closed off on claims of "security."

Claimant was sent back to recuperate in SHU (Special Housing Unit, or jail for the prison). This is the equivalent of taking a person in the free world straight from major surgery in the hospital to the local jail, to solitary confinement, in a facility that makes a complete and utter mockery of the standards of the American Correctional Association (ACA) and other accrediting authorities.

Oakdale-1 denied Claimant a ladder to hold to in order to maneuver in and out of bed. Oakdale-1 denied Claimant translucent windows, a decent bed and pillow, etc. In short, Oakdale-1 did what it could to make Claimant miserable, in flagrant disregard of the Standards and Expected Practices of the ACA. Claimant hereby incorporates Docket #27 of Stilley v. US et al, EDAR 2:15-cv-163 BSM/BD, (available on PACER) as if attached hereto and set forth word for word. Oakdale-1 is grossly negligent in failing to comply with the ACA rules and Expected Practices, despite repeated polite offers of help from the inmate population.

Oakdale-1 advertises itself to be accredited by the Joint Commission, with a certificate on the wall, yet the Joint Commission says that Oakdale is NOT accredited by their organization.

On or about 5-19-17, Claimant began to feel fluid leaking from the surgical incision some time after returning to Oakdale-1 SHU. Claimant told the medical personnel, but was not allowed to go back to the doctor.

Claimant returned to the doctor on May 31, 2017. The doctor was shocked to learn that fluid had been leaking for about 12 days. The doctor explained that spinal fluid was leaking, and that this leakage could have resulted in severe permanent disability. The doctor repaired the damage.

Claimant talked in his sleep due to the medications given for pain. One of the guards became angry and began hurling epithets, saying "fuck you!" over and over. Claimant despite his hazy consciousness tried to explain that he was sick and wasn't talking or disturbing the guard on purpose. The guard nevertheless continued to say "fuck you!" to Claimant. Claimant was terrified and could not sleep

for the rest of the night.

On or about 6-5-17 Plaintiff was taken from the hospital to Oakdale-1 SHU. Claimant was placed in a regular SHU cell, the same sort of cell which an inmate would occupy as punishment for violating prison rules. Claimant was forced to sleep on a highly unsuitable mat, without a pillow reasonably suited for recovery from surgery.

Claimant was denied the assistance normally provided by other inmates with charitable impulses. Claimant remained in SHU until 6-19-17, whereupon Claimant returned to the compound.

Other federal prisons have medical rooms with real beds and real pillows and windows that allow the inmate to look outside the room. There is no logical reason that Oakdale-1 could not do the same, if a decision was made to prepare, maintain, and use such a room.

PARAGRAPH TEN. State nature of extent of injury that forms the basis for the claim:

1) Claimant was utterly miserable and could not defecate for about 35-40 days. During this same period of time Claimant suffered extreme pain, and could get around only with extreme and increasing difficulty.

Claimant lost weight, from a starting weight of about 174 pounds down to 139 pounds before he had to quit eating to prepare for surgery. The cessation of eating preparatory for surgery only reduced Claimant's weight by about 3 additional pounds, down to 136.

The denial of a wheelchair forced Claimant to allow other inmates to get on each side of him, in order to keep him from falling. This was humiliating, debilitating, and painful, since the other inmates had to exert substantial force to keep Claimant from falling down. Many DOJ-FBOP personnel observed the Claimant wobbling his way back and forth to chow hall and to Health Services, yet nobody intervened to see that Claimant was provided with a wheelchair and an inmate assistant.

Claimant suffered unnecessary physical pain and mental anguish from the time that his initial visits to medical were brushed off and treated as if they were mere psychological weaknesses, up through and including the time that he was finally discharged back onto the compound June 19, 2017. Had Claimant received competent medical evaluation, diagnosis, and treatment, Claimant could have gotten treatment by a competent surgeon, with a reasonable place to recuperate, which would have taken a relatively short period of time.

Claimant's recuperation time was made miserable, and lengthened, by denying Claimant a reasonable bed, in a reasonable room, maintained in compliance with all the Standards and Expected Practices of the ACA. Claimant's window with transparent glass had a piece of cover glass over it, that lets in a small amount of diffuse light, but through which one cannot see anything. The failure to maintain proper rooms, in full compliance with the ACA, for convalescence and recovery from surgery or other procedures amounts to negligence or gross negligence or worse. Such neglect and failure in this case caused Claimant serious suffering, damage, and harm both physical and psychological.

Claimant suffered the loss of spinal fluid for about 12 days, between the time that he reported it and the time he finally got appropriate care. This amounts to negligence, gross negligence, or worse, which increased the total time of convalescence, loss of function, loss of the normal pleasure of living, etc.

After the surgery, all the symptoms set forth above promptly disappeared, with the following provisos. Claimant is now left with a spot on his left eye, which started about the time Claimant was no longer able to walk unassisted, about 3 days prior to the surgery. In addition, Claimant now shakes, has difficulty remembering things that were previously easy to remember, and does not have the fine motor skills that he had before.

As a result of the shakes, loss of fine motor skills, damage to memory abilities, and other damage to brain and nerve tissue, etc., occasioned by the undue delay in treatment, Claimant is disabled from performing many activities which he formerly performed. For example, Claimant was a licensed pilot. Due to the damage set forth in this paragraph, Claimant is not qualified to be a licensed pilot. Only time will tell if this injury will heal up, to the point that Claimant can enjoy such activities as flying airplanes. The damage to Claimant's ability to function at a high level, sufficient to be a licensed pilot, and do other high skill activities, is the result of delay. Claimant reported the problem timely, before the symptoms became extreme, and could have had the full restoration of function at a high level, if he had received TIMELY evaluation, diagnosis, and treatment by competent medical providers.

Claimant has also suffered psychological injury as a result of coming to know, experientially, that Oakdale-1 will deny an inmate appropriate medical care until the inmate quite simply loses consciousness. Plaintiff continues to suffer psychologically from the knowledge that his medical care is totally within the control of an organization that shamelessly turns its head from the most horrific illnesses, injuries, diseases, and medical conditions.

PARAGRAPH ELEVEN. Witnesses: Medical and scheduling personnel of any level of the DOJ-FBOP having knowledge of relevant facts, including but not limited to backlogs, failure to provide logistical support for medical trips, etc; inmates in

4

Claimant's housing unit who had to help Claimant get around.

)
)

By:_____          _____
Rafael Daniel De La Cruz-Jimenez                Date

MEDICAL RECORD RELEASE AUTHORIZATION AND FOIA REQUEST IN FAVOR

OF DOJ-FBOP and: _____

The SF 95 Tort Claim requests that the claimant provide certain information including physician reports, itemized medical bills, etc. By my signature on the Certificate of Identity below, I authorize any custodian of my medical records, medical bills, etc., to release same to the agency set forth above, on condition that I also receive a copy. Pursuant to the Freedom of Information Act (FOIA), I request that the said agency supply me with all medical or dental records or bills, etc., relation to me, in the possession of the said agency, or obtained, form any source, during the consideration of the instant SF 95 Tort Claim. I request that the said agency waive any fees because these are my medical records, (broadly construing the term) and because they may be necessary for the evaluation, negotiation, and settlement of my claim. Any custodian of records is entitled to presume the good faith of the said agency, and assume that I will be provided a set of said records reasonably contemporaneously with their receipt, and will be held harmless for operation under that assumption. I will provide signed releases and further assurances as necessary, upon request to me at the address set forth above, in paragraph 2 of the SF 95 Tort Claim. Pursuant to the FOIA, I also request:

Exhibit "4"

IMPROVISED CERTIFICATE OF IDENTITY (Form DOJ-361; OMB# 1103-0016)

Full NAME and CURRENT ADDRESS of Requester, see paragraph 2 above. For DATE OF BIRTH, see paragraph 4.

Citizenship Status: __Dominican__

Social Security Number: __None__       Place of Birth: __Santo Domingo__

__[signature]__                __Rafael Daniel DelaCruz Jimenez__   __7-13-17__
Signature                     Printed Name                          Date

Absent substantial controversy as to authenticity, a copy of this signature shall be deemed equivalent to an original.

OPTIONAL: Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person. Furthermore, pursuant to 5 USC §52a(b), I authorize the US Department of Justice to release any and all information relating to me to:
Email: Yaritza_hotmail.Com
Tel: 603-858-5064 Cell

__Yaritza Dela Cruz, 3 Hancock Street, Lawrence, MA Lawrence, MA 01841__
PRINT OR TYPE NAME, ADDRESS, OTHER RELEVANT CONTACT INFORMATION OR AUTHORIZED RECIPIENT (IF ANY)

U.S. Department of Justice

Federal Bureau of Prisons

South Central Regional Office

*U.S. Armed Forces Reserve Complex*
*344 Marine Forces Drive*
*Grand Prairie, TX 75051*

JUL 20 2017

Rafael de la Cruz-Jimenez
Reg. No. 56269-004
Federal Correctional Institution I
Post Office Box 5000
Oakdale, Louisiana 71463

Re: Administrative Tort Claim - TRT-SCR-2017-05564

Mr. de la Cruz-Jimenez:

This acknowledges our receipt of your claim, dated July 13, 2017, filed pursuant to the Federal Tort Claims Act for alleged personal injury. The Federal Bureau of Prisons received your claim for processing on July 17, 2017.

Claims processed pursuant to the Federal Tort Claims Act normally receive a response within six months. Accordingly, you may expect a response from this office on or before January 16, 2018.

Sincerely,

*[signature]* for

Jason A. Sickler
Regional Counsel

JAS/bkv

Exhibit "5"

October 30, 2017

Rafael de la Cruz-Jimenez
Reg. No. 56269-004
Federal Correctional Institution
P.O. Box 5000
Oakdale, LA 71463-5000

Exhibit "6"

Mr. Jason A. Sickler
Regional Counsel
South Central Regional Office
344 Marine Forces Drive
Grand Prairie, TX 75051

Re: Administrative Tort Claim - TRT-SCR-2017-05564
Registered Mail Receipt #7016 3010 0000 7583 9961

Dear Mr. Sickler,

I am in receipt of your letter dated July 20, 2017 informing me of the receipt of my Tort Claim and the time line involved. I would like to make you aware of some other information that was not included in the Tort Claim form that I submitted, and would like to amend it to include the following.

On or about the beginning of April, 2017, inmates Rick Contreras, ID number 82564-179 and Leudy Mendez Matos, ID number 23504-069, escorted me, inmate Rafael de la Cruz-Jimenez, to the facility hospital, where Medical Staff then kicked us out, reasoning that I had nothing wrong with me; after they couldn't or wouldn't do anything for me. The other inmates and I, after leaving Medical, happened to notice that Captain J. Bermingham and one of the Lieutenants were walking into the Lieutenant's Office; we followed them inside. Once there, the other inmates and I explained the situation and my condition. We told them what Medical Staff told us, which was: "that there was nothing wrong with me; it's just a mental problem; and to get out of there, all of this without any sort of exam whatsoever. After hearing this, the Lieutenant went to the Captain and explained what we had told him. The Captain replied with: "I'm NOT a hospital; take him to the hospital!" We again asked the Lieutenant to assist us; assist me for the needed help, where he then stated: "De La Cruz, they make more money than I do; this is over my head!" The other inmates and I then left the office and returned to our units.

On or about April 26, 2017, at approximately 11:00 am, I fell in the Dining Hall suffering from the symptoms and the incapacitated state that I had previously reported on February 10, 2017. After falling out at the Dining Hall, I was then finally admitted into the facility Medical Department. Once there, I was examined. I felt very sick. I felt as if I was going to vomit/spit up/ spill out. I had accumulated a lot of mucus and/or saliva in the back of my throat. I overheard some Medical Staff saying: "Don't you spill out on my floor!" The staff member then, with some guaze in his hand, slammed me in my face, cause the mucas to spread over my face. This staff member was called "Rocky".

1 of 3

Later that same day, on my way out of the Medical Department, on a stretcher, I heard the Lieutenants and other officers saying: "There's nothing wrong with him; he wants to be outside of the prison, that's all."

On or about May 10, 2017, at approximately 11:00 am to 12:00 pm, I was escorted by four different inmates which took me to just outside the officers mess hall, where we saw Warden Calvin Johnson, Captain J. Bermingham, and the Assistant Wardens. Once there, inmate Rick Contreras tried to explain the seriousness of my condition and situation. The officers just ignored me and the gravity of my incapacitated state. Being rejected and ignored, the only reaction we received was the Warden, Calvin Johnson, screaming at us to go to Medical. The four inmates then escorted me, almost carrying me, to the institution Medical Department.

Later that same day, at approximately 2:00 to 3:00 pm, RNC Savanna was questioning if I was really sick and commented: "You get what you play!" Suggesting that I was only playing or faking my illness.

I was then taken to the local community hospital where the doctors determined that I had a brain tumor and that if I had been denied proper medical treatment much longer, in addition to the reduced longevity of my life and irreversible neurological issues and or brain damage that I continue to suffer with, I may have been incampacitated completely or worse, dead.

On or about May 16, 2017, after I returned from the local community hospital, after brain surgery, I was placed in the Special Housing Unit (SHU) and locked into a cell, without a change of clothing, materials to clean myself, TV or Radio, or just simple freedom of movement other than what you could achieve in a 8½ foot by 6 foot cell.

On or about May 19, 2017 Dr. Alexandre and the secretary of the institution hospital made a visit while I was in the SHU at approximately 9:00 am. The doctor asked me: "What is your leg problem?", however, before I was able to respond, the secretary said; "Remember, De La Cruz came in with a lot of different issues, he had **Brain Tumor Surgery**." Dr. Alexandre responded, "Ohhh, what?" The secretary said, "You didn't know?" It was obvious the doctor did not know of my medical situation, the surgery, the problem with my leg and all the incidental issues leading up to my brain surgery. The doctor's lack of knowledge, considering the number of times I had gone to the medical department and out to the community hospital, reveals his indifference, incompetance and an unwillingness to perform within his scope of the job and duties as employees of the United States government as stated in 5 CFR §2635, to wit:

Basic Obligation of Public Service

"Employees shall put forth honest effort in the performance of their duties."
"Employees shall disclose waste, fraud, <u>abuse</u>, and corruption to appropriate authorities."
"Employees shall endover to avoid any actions creating the appearance that they are viollating the law or the ethical standards set forth in 5 CFR §2635.101."

Inmate De La Cruz attaches clinical reports to this statement showing that on May 12, 2017, he underwent a brain surgery operation to remove brain mass and drain cyst.

Inmate De La Cruz encloses the names of the Administratiors and Medical Staff that showed "Deliberate Indifference". These officials were intuitively aware of the "Substantial Risk" of serious harm to this inmate for almost four months. That they were violating his Eighth Amendment rights by providing shockingily deficient medical care is evident by the Medical Staffs total disregard for the requirements of the following B.O.P. Program Statements:

P.S. 6027.72 "heallth Care Provider Credentiall Verification Statement"
"Health care practitioners assume responsibility to maintain and improve their knowledge and skills in order to deliver quality care consistant with accepted current standards of practice."

P.S. 6013.01 "Heallth Services Quality Improvement"
Under "The Elements of PDCA" that Health Care providers :
"Do or deliver the planned services."
"Do the right thing (the efficacy and appropriateness of the care or treatment provided."
"Do the rght thing well (the availability, timeliness, effectiveness and continuity of services provided."

Neither of these Program Statements were followed by the Medical Staff as required of all Bureau of Prison employees.

The names of the Administratiors and Medical Staff involved in this complete indifference to proper care are as follows:

Calvin Johnson, Warden
Benjamin J. Bermingham, Captain
Mary Thomas, F. NP-C
Ms. Dahotey,  RN
Ms. Dowtey, RN
Willis, T.  LPN
Ms. Carol Autin,  RM
Ms. Rashauna Moody, ANP-BC

Dan Peterson, A.W. Warden
Alexandre, Joel,  MD/DC
Savant, Theresa, F NP
Ms. Altine, RN
R. (Rocky) Catoire, RN
Ms. Elizabeth Perkins, RN
Ms. Keri Dowdy, RN
Ms. Kertin Ducote, RN
Ms. Patricia Bradford, RN

At this time, I have good faith and belief, after consulting with my legal advisor, that I should increase my personal injury claim to a minimum of $150,000,000.00.

This inmate, Rafael Daniel De La Cruz Jimenez, swear under penalty of perjury pursuant to 28 U.S.C. §1746, that the above information is true and correct to the best of my knowledge. Signed and dated on this 27th day of October 2017.

Rafael Daniel De La Cruz Jimenez



U.S. Department of Justice

Federal Bureau of Prisons

South Central Regional Office

*U.S. Armed Forces Reserve Complex*
*344 Marine Forces Drive*
*Grand Prairie, TX   75051*

NOV 0 9 2017

Rafael de la Cruz-Jimenez
Reg. No. 56269-004
Federal Correctional Institution
Post Office Box 5000
Oakdale, Louisiana 71463

Re:  Administrative Tort Claim - TRT-SCR-2017-05564

Mr. de la Cruz-Jimenez:

This acknowledges our receipt of your supplement pertaining to the above mentioned claim.  The correspondence was received by the Federal Bureau of Prisons for processing on November 3, 2017.

Claims processed pursuant to the Federal Tort Claims Act are allowed an additional six months to consider supplemental information submitted.  Accordingly, you may expect a response from this office on or before May 2, 2018.

Sincerely,

Jason A. Sickler
Regional Counsel

JAS/bkv